## DRIGGS et al. v. CLARK.

### Patent Appeal No. 4808.

Court of Customs and Patent Appeals.

Jan. 4, 1944.

Robert H. Wendt, of Chicago, Ill. (Albert G. McCaleb and J. David Dickinson, both of Chicago, Ill., of counsel), for appellant.

Clarence J. Loftus, of Chicago, Ill. (Loftus, Moore, Olson & Trexler, of Chicago, Ill., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal by Driggs et al. (joint inventors) from the decision of the Board of Appeals of the United States Patent Office affirming the award of priority to the party Clark by the Examiner of Interferences in an interference declared by the Primary Examiner June 7, 1939.

A third party (joint inventors) was originally involved but was eliminated by judgment on the record.

The interference is between the application, serial No. 140,778, of Driggs et al. (assigned to the Fansteel Metallurgical Corporation of Chicago, Illinois, employer of Driggs et al.) filed May 5, 1937, and the

application, serial No. 168,899, of Clark (assigned to the Magnavox Company of Fort Wayne, Indiana), filed October 14, 1937.

As the junior party the burden rested upon Clark to establish his case by a preponderance of the evidence, and testimony was taken in his behalf. Testimony was also taken on behalf of Driggs et al., but as the case is presented before us reliance is placed solely on the filing date of the application—May 5, 1937.

The subject matter relates to electrolytic condensers, particularly to alleged improvement in the structure of a film-forming electrode on an anode. Two counts are involved which read:

"1. A porus electrolytic condenser element made up of a rigid self-supporting homogeneous sintered body of discrete valve metal particles bonded together.

"2. A porous electrode for electrolytic condensers, comprising a self-supporting porous mass of finely divided particles of tantalum permanently conductively attached to each other at spaced points on their surface."

While, as stated above, the board affirmed the award of priority to Clark by the Examiner of Interferences, it disagreed as to certain of the latter's findings.

The Examiner of Interferences awarded Clark a conception date of "at least as early as December 14, 1936," but awarded him no date for actual reduction to practice, and found absence of proof of diligence on the part of Clark, finally saying, " * * * in so far as the priority proofs are concerned, the party Clark has failed to establish that he was the prior inventor." He held, however, that Driggs et al. derived the invention from Clark. So, in fact, his decision in the final analysis, turned solely upon the question of originality.

The board disagreed with the holding of the Examiner of Interferences respecting Clark's conception date (December 14, 1936), but awarded him a conception date of December 17, 1936. It also disagreed with the holding of the Examiner of Interferences to the effect that Clark had not reduced the invention to practice prior to the filing date of the application of Driggs et al., and held that Clark reduced the invention to practice December 22, 1936, saying:

"It appears to us that Clark has proved his priority case by a preponderance of the evidence especially where Driggs et al. made no attempt whatever to establish priority of conception or a prior actual reduction to practice."

So, it appears that the decision of the board awarding priority to Clark is based primarily upon its finding of Clark's prior conception and reduction to practice. However, it went further and, in effect, approved the finding of the Examiner of Interferences on the question of originality, saying:

"We are also satisfied that Driggs et al. obtained their information as to the broad counts in issue from Clark. It is clear from the Driggs record that whatever they may have invented over Clark was not completed until May, 1937."

It will be observed that the date awarded Clark by the board for conception (December 17, 1936) is only three days later than that (December 14, 1936) awarded him by the Examiner of Interferences (the respective awards being made upon the basis of different exhibits), and that the date awarded him for reduction to practice (December 22, 1936) is only five days later than that awarded him (by the board) for conception.

Particular attention has been called to the foregoing dates because of the question of originality upon which the tribunals of the Patent Office agreed, although they differed as to Clark's conception date.

It seems to us that upon the question of originality the precise date of Clark's conception is of primary importance. We say this because it is obvious from the record that whatever disclosure may have been made by Clark from which Driggs et al. may have derived the invention were made on either December 15, 1936, or December 16, 1936, on one or the other of which dates Clark personally went to the Fansteel Metallurgical Corporation to procure a slug of porous tantalum. He there contacted Mr. Frederick L. Hunter, chief engineer of the tantalum division of the Fansteel Metallurgical Corporation. It is alleged (and the Examiner of Interferences held) that Clark then disclosed to Hunter his conception of the invention and that Driggs et al. received knowledge of such conception from Hunter. No other date of such disclosure by Clark to officials or

employees of the Fansteel Company is alleged, claimed, or shown in the record.

Obviously, if the board's holding meant that Clark did not conceive the invention earlier than December 17, 1936, and was correct, Clark could not have made disclosure of it to Hunter on December 15, or December 16, 1936, and there would seem to be no basis in the record for the board's conclusion on the question of originality, notwithstanding the fact that Driggs et al. in their brief before us concede that the board's finding of conception by Clark on December 17, 1936, "is not a contested question."

It is contended, in substance, on behalf of Driggs et al. that the board correctly overruled the holding of the Examiner of Interferences accrediting Clark with a conception date as of December 14, 1936. The Driggs et al. brief (page references omitted) states:

"The party Clark established as of December 14, 1936 his authorship of a notebook page * * *, which he contends evidences a conception of the invention. The Examiner of Interferences held it satisfied the counts * * *; the Board of Appeals held it did not * * *. This is a question in issue."

While Clark did not appeal from the board's decision awarding him December 17, 1936, as the earliest date for conception, it is the well settled practice that he, as appellee, is entitled to have us consider the date awarded him by the Examiner of Interferences, and we have accordingly examined the proofs upon which the finding of the Examiner of Interferences in that regard was based.

It was based primarily upon a description written by Clark in longhand in his notebook, and dated December 13, 1936, the same being witnessed by J. K. Nieh and Ralph W. Clark, under date of December 14, 1936. A photostatic copy is embraced in the record as Clark's Exhibit 1. It appears that Ralph W. Clark, who was an employee of the Magnavox Company, is not related to appellee. He was called as a witness and testified that he signed the document on December 14th. Nieh appears to have been in a foreign country at the time this testimony was taken and his testimony could not be obtained. It is conceded in the brief for Driggs et al. before us that Clark established authorship of the notebook page, as of December 14, 1936,

and its authenticity is not in question, the only question raised concerning it being that it does not satisfy the counts, and hence does not evidence conception.

The notation reads in full:

"New Ideas.

"Dec. 13, 1936 Conceived idea of compressing filming metal powders to form a porous anode for electrolytic condenser to obtain a high capacity from a small volume of anode. Powders may be all of one kind or a mixture of two or more may be used also a mixture of equal sized particles or unequal sized. Further a mixture of Aluminum & magnesium, Tantalum & Magnesium Berrylium and magnesium or two or more suitable filming metals may be used with Magnesium added and any of these magnesium bearing mixtures may be heated in a controlled atmosphere (after being first compressed) to cause the magnesium to combine with oxygen thus leaving a porous mass of filming metal which at the same time will have its particles fused together due to the heat from the reaction between the magnesium and oxygen. These anodes may be in such a shape as to give a condenser having a minimum power factor.

"Conceived by R. U. Clark, Dec. 13, 1936

"Witnessed by J. K. Nieh, Dec. 14, 1936

"Witnessed by Ralph W. Clark, Dec. 14, 1936."

It will be observed that count 1 of the issue requires a " * * * *sintered* body of discrete valve metal particles bonded together" and that count 2 requires a " * * * porous mass of finely divided particles of tantalum permanently conductively attached to each other *at spaced points* on their surface." (Italics ours.)

In his decision the Examiner of Interferences did not comment upon the meaning of those limitations, but the board, referring to Clark's Exhibit 1, said:

"We find nothing in this exhibit which relates to a homogeneous sintered body or finely divided particles of tantalum permanently conductively attached to each other *at spaced points* on their surface." (Italics quoted.)

However, the board then discussed Clark's Exhibit 2 (upon which its award of conception as of December 17, 1936, was apparently based) which consists of

an interoffice communication, reading as follows:

"(Interoffice communication)

"Attention of J. I. Cornell.

"Copies to S. S. Sondles.

Date Dec. 17, 1936

Subject Porous Anodes.

"As a matter of record may I advise that I called on Fansteel Co. in North Chicago yesterday, and ordered a few square inches of pressed scintered tantalum powder with which to make porous anodes along the lines suggested to you the other day, and as covered by my notes in my lab book.

"This material is sufficiently porous to filter water through, and is the base from which they make tantalum metal, therefore much less expensive than the latter. As you know pressed powdered metal is fairly strong and porous, and when scintered it is stronger and more porous.

"As I mentioned to you my idea is to try various filming metals in pressed powder form, and also to press and heat various mixtures of filming metals, that include a percentage of magnesium, then flash off the latter leaving a very porous form of metal which should give a very high capacity in a very small volume of material in electrolytic condensers. This tantalum powder scintered being readily available seemed well worth testing.

"I expect to have the above mentioned material shortly. I also obtained a great deal of information relative to tantalum during my visit.

"Sincerely,

"R. U. Clark.

"(Signed)    R. U. Clark"

In its discussion, the board, citing the testimony, said:

"Clark Exhibit No. 2 indicates a conference with the Fansteel Company on December 16, 1936, relative to pressed *sintered* tantalum powder for a porous anode. We believe it fair to conclude that Clark had an idea of *using a porous tantalum electrode* in an electrolytic condenser before he called on Fansteel. The reason for this visit to Fansteel was obviously to seek a source of readily available porous tantalum and Clark thought that the *sintered tantalum would be well worth testing* * * *. This is confirmed by O'Connor * * *." (Italics ours.)

We deduce from the foregoing that while it was the board's view that Clark's Exhibit 1 was not of itself a disclosure of the particular elements of the counts above described, he nevertheless had the ideas embraced in them in mind before he called on Fansteel.

However that may be, it must be held upon the record before us that unless conception of the counts is found in Clark's Exhibit 1, there was no disclosure of their subject matter to Hunter at the time alleged since there is no satisfactory evidence that Clark sought to obtain from Hunter any material other than that described in that exhibit.

We have, therefore, quite carefully studied Clark's Exhibit 1.

It does not use the word "sintered," but, as we view it, the mere fact that the word itself was not used therein is unimportant. The exhibit clearly discloses conception of a *porous* anode (the porous feature being new to the art) for an electrolytic condenser, to be composed of metallic powders either "all of one kind or a mixture of two or more [kinds]," tantalum being specifically named as one material suitable for use, and describes a process (heating in a controlled atmosphere after being compressed) which results in the production of a "porous mass of filming metal which at the same time will have its particles fused together * * *." It is clear, we think, that Clark's conception was of a product composed of particles so fused that the product as a whole remained porous. No other construction appears reasonable, and it seems to us that such a product of necessity would be sintered in that the particles of material are so permanently attached to each other through the application of heat that a porous selfsupporting structure results.

It is clear from the testimony of both Clark and Hunter that the former went to the plant of the Fansteel Company for the purpose of obtaining a slug, or piece, of porous tantalum for condenser use, and it is conceded that he received it and used it a few days later in the tests of December 22, 1936. We do not think it important whether or not the word "sintered" was used in the conversation between Clark and Hunter because that which Clark obtained was necessarily a sintered product, in the sense above described, which clearly is the

sense in which the word "sintered" is used in count 1.

With regard to the limitation in count 2 respecting the particles being conductively attached to each other *"at spaced points"* (as italicized by the board) on their surface, it seems clear to us that this feature is of necessity inherent in the product as described in Clark's Exhibit 1. It obviously results from the process described in the exhibit.

■ We, therefore, agree with the finding of the Examiner of Interferences that Clark is entitled to an award of conception as of December 14, 1936, and the question, so far as originality is concerned, is whether he disclosed this conception to Hunter on either December 15, or December 16, 1936, on one or the other of which dates (the Examiner of Interferences named December 15) the conversation between them took place.

The board did not review the testimony bearing upon this phase of the controversy but merely stated, in the language above quoted, its agreement with the conclusion of the Examiner of Interferences regarding it. The latter reviewed the record at considerable length and we quote the following from his decision:

"It appears * * * that the question of originality and derivation of the invention by Driggs et al. from Clark is raised by reason of the fact that Clark visited the Fansteel Company, the assignee of the Driggs et al. application, on December 15, 1936 and disclosed to Hunter the subject matter of the invention in issue, namely, the use of porous tantalum as an electrolytic condenser anode.

"Howard, one of the joint inventors, testified that at about the time of his development work he learned of Clark's work through the call report circulated by Hunter * * *. The development work which Howard testified about seems to relate to the etching and sand blasting of tantalum anodes and does not constitute the subject matter in issue but is matter which was old in the art prior to the discovery of the utility of the porous tantalum anode. Hunter testified, as heretofore stated, that Clark visited him on December 15, 1936 and while he states that he was not sure that Clark disclosed to him at this time that he would use the porous tantalum as a condenser anode, he seems to indicate that he had the idea at that time that the device would be used for this purpose. Clark, on his part, states that he disclosed the use to Hunter.

"While the call report has not been introduced in evidence, due to an objection on behalf of counsel for the party Clark, the testimony as it is adduced both in the record for Clark and the record for Driggs et al., indicates that Clark disclosed the invention to the assignee of Driggs et al. prior to any conception on behalf of Driggs et al. and that this conception was known to at least one of the joint inventors prior to any conception by them. The conclusion is inescapable, therefore, that Driggs et al. derived the invention from Clark. Vidaver v. Sherman, 54 App.D.C. 173, 295 F. 994, 325 O.G. 221.

"Driggs et al. contend that the record does not show derivation by reason of the fact that Driggs et al. improved the Clark idea by obtaining a more porous tantalum anode by a careful processing method. This, however, is a mere mechanical improvement well within the realm of skill in the art and the conception of the broad idea as it is defined in the counts is obviously that of Clark and not of Driggs et al. In fact, Driggs et al. in uncorroborated testimony do not even allege a conception on their part but merely state that the first porous anodes were made by them in the latter part of January, 1937, well after the disclosure to them by Clark."

■ We have carefully examined the record in the light of the briefs and the oral arguments made before us, and we see no reason to disagree with the holdings so made relative to either the facts or the law.

Under this view, it is unnecessary for us to pass upon the question of Clark's reduction to practice upon which the tribunals of the Patent Office disagreed.

The decision of the board is affirmed.

Affirmed.